May it please the court, Jason Carr, appearing on behalf of Appellant Zavala-Esquivel. I'd like to reserve two minutes of my time for rebuttal, if I may. You may do so. 4 Pro B evidence is often referred to as prior bad act evidence. But the use of that term in the incident case would be a misnomer because the prior incident that we are challenging on appeal would be more properly characterized as an innocent prior act. And as an innocent prior act, it lacks probative value. And it lacks probative value for other reasons, but I'll get to that in a minute. Why do I say it's a prior innocent act? Well, we know that this is an incident that resulted in no conviction, indeed not even an arrest. This is an incident where Zavala was absolved by even a civil standard of proof. Didn't he lose the vehicle? No, he didn't. It was remitted back to him. He did get it back. Yes, he did. And, in fact, he received the vehicle because he wrote a letter. And that letter will come up in a moment, the pertinence of that letter. I'm sorry, did I interrupt? The context, as I understand it, is that the defendant indicated that he had started a transportation business to transport workers to fields and so forth at about the same time. So wouldn't it be at least somewhat relevant to establish that, well, maybe he wasn't just transporting farm workers but illegal aliens? That's a good point, Your Honor, that his business did not begin until after this prior incident started. His business, he applied for his licenses in April of 1997. This prior incident occurred February of 1997. Well, it was more or less contemporaneous, I mean, within a couple of months. Perhaps, but the facts of this prior incident are not at all similar to the offense that was charged. And why do I say it's not similar? For one, this is an individual giving a ride to somebody for personal reasons. There was no pecuniary motive. He wasn't going to get money for it. He met his friend in San Diego, a friend who he knew who was in the country legally. His friend had another friend. He gave them both a ride. They're stopped at a border checkpoint. It turns out one of the individuals had a green card, but it wasn't his. Now, INS was not able to immediately discover that this was a false green card. They had to, in fact, examine the fingerprints. They did a fingerprint analysis before they figured out that this one individual had a green card that wasn't, in fact, his. Now, the government has this theory, pure speculation, that's not even the most likely explanation, that Mr. Zavella examined this other person's green card and knew that it wasn't that person's green card because that green card was from somebody in his friend's family. And the reason why they, and they get this evidence because Zavella, after his vehicle, after he sees at the border checkpoint, his vehicle is detained. On April 8th, he writes him a letter saying, this is my vehicle. Can I please have it back? Now, we don't know what happens between April 8th and April 14th, but on April 14th, a letter is sent in to INS which says, which expands upon what happens, and in that letter, Zavella says, I knew the other, I knew my friend, I asked the other individual for ID, and he showed me a green card. Now, he does not say that I examined it in searching detail. He does not say that, he does not say that he looked at it and read the names on it or anything. And here, there's so many complexities to this issue. It's just layers upon layers of error. The only reason why this evidence came in about the letter is because the government introduces Zavella's letter to the jury. It was read to the jury. This letter, you could arguably say it's a party admission, but it just stinks. It stinks because it seems extremely unreliable. And why is that? Because he was under compulsion to write the letter in to get his car back. It's strongly probable that what he said in the letter is not, in fact, true. It's very probable that Mr. Zavella never asked anybody for any ID. He just gave these people a ride, and he lied about it in the letter to get his car back. That's why we usually don't let stuff like this into evidence. But it came in in this case. Now, another thing we have to look at here, Your Honors, is why is this prior incident similar to the other incident, the incident that was charged? In the incident that was charged, there's all these individuals in the van who are smelly. The government says the van is overcrowded, but, in fact, all the illegal immigrants had seats. Every one of them. The only person who stood in the back was one of the drivers. They're unkempt. They're dirty. And the government points to all this evidence saying, okay, this is how we knew that these people were illegal. None of these factors are apparent in the 1997 incident. I mean, there's a van, a minivan, a different minivan that's involved. That's one similarity, but that's not very significant. There's no evidence in the 1997 incident that anybody was smelly. The van certainly wasn't overcrowded. There's only three people in it. There's only one person in it who wasn't paying. He was just giving his friend a ride, his friend's friend a ride. I mean, these instances aren't similar. And I would point the Court to a case that I believe is pertinent to examination of this issue, which is Herrera-Mendina, which is cited in both mine and the government's briefs. And in there, they say that the inference of knowledge in an alien smuggling case of a prior incident is only relevant if the facts of that prior incident support inference that at that time the individual knew the aliens were illegal. In this case, the prior incident does not support that inference. The most probable explanation was that Mr. Zavella inadvertently gave somebody a ride who turned out to be illegal. How does that have any probative value over whether three years, eight months later, that Mr. Zavella was giving individuals a ride when he had a transport business that was in place who turned out to be illegal? Where is the logical thread, the connection here? I would submit that there isn't. But that's not the biggest problem here. One of the biggest problems with this prior incident is the mode of entry. And this ties in. How did the government get this evidence into the record? And this ties into the fact that there was no arrest or conviction. Normally, a 404B evidence that the government will do, generally it's a conviction, is submit the certified judgment of conviction. Or they'll have evidence from an agent who had personal knowledge of what happened if it's an arrest. Here, nobody had any personal knowledge. Nobody remembered this incident because it wasn't significant. And so what they had to do was get an agent, get on the stand who had no independent recollection, and read what is essentially a law enforcement report into the record. Standard black letter law that you cannot read a police report into the record. It is not a public record. In fact, the notes to FRE 8038 say specifically that Congress, when they fashioned that rule, did not need to have police reports or law enforcement investigative reports come in because they're inherently unreliable and it's an adversarial document. Now, the government's probably going to say, well, even if all that were true, it's still harmless error. That's a great point, Your Honor. And let's look at what the government says about harmless error. Let's go to the government's brief, page 24. This is an important point. They say, first of all, on page 24, their briefs are trying to argue that the error is harmless. And they say, and I say this is a misleading statement by the government, the defendant told Agent Calamas that his passengers had no immigration documents and they were born in Mexico. Now, what happened here was on the arrest that led to this conviction, a Hoover Dam police stopped my client and he was detained at the side of the road an hour before Agent Calamas showed up. If you go to the EOR, page 12, there's a factual finding from the district court after a motion to suppress. And what that says is that when the first officer stopped Mr. Zavella, he asked if any of the individuals in the van had documents, at which time Zavella, after conversing with his passengers in Spanish, he indicated that none of them had documents. So rather than what the government's trying to say is that he knew they didn't have documents all along, what the evidence and what the factual finding of the district court was is that he did not find that out until after the stop and he asked them in Spanish after the officer's request. Counsel, you're down to two minutes. I am. I'm going to have to sit down. It's your choice. You can use your time. I'd like to reserve it for rebuttal. Thank you. Very good. All right. You may do so. Mr. Roberts. Good morning. May it please the Court. I'm Justin Roberts. I'm an assistant United States attorney from the District of Nevada. I was also a trial counsel on the case below. I'd like to use some of my time just to respond to some of the counsel's statements. First of all, there was nothing inadvertent about the 1997 incident. The evidence that's in the record, and I'll cite excerpt of record 308, was that Mr. Zavala knew the true owner of the identification document that was presented to him by someone else. 308, line 14, the principal identified as Mr. Zavala stated that he had known Torres Rodriguez and his brother, the true owner of the form I-551, presented by Jose Akiwe-Panaloza, who happened to be the illegal alien who was transported, for a long time. Zavala stated he had been a friend of the Torres family since 1988 and knew Torres and his brother since all three had worked in Topanish, Washington, so he therefore knew that the holder of that card was not the true person reflected on the I-551. And that's the larger argument, and that is, you know, this is 404B is a tricky area. And the fact here is that there was no arrest and no conviction with respect to that whole incident. Well, Your Honor, first of all, there's no requirement under the 404B that it be an actual arrest or conviction as the prior act. The rule itself says prior acts, and this Court has upheld the admission of previous acts of a defendant in an alien smuggling case that did not result in an arrest. For instance, the Ramirez-Yemenez case in 1992, there were no arrests. How relevant is it that he was stopped, if that's all there is here, that he was stopped and they took his car but he got it back? I mean, what's the relevance of all of that? The relevance that he was stopped, first of all, it's more than just an act that happens to have been brought forth by someone else in the past. It's contact with law enforcement because of the fact that there's an illegal alien in his car. It's not dissimilar from the act charged in the indictment. So, in fact, it shows more that it's more akin to an arrest or a prosecution, although there was no arrest. There was at least a seizure of the vehicle. And counsel, in his statements, indicated that Mr. Zavala was compelled to write this letter. Yes, in order to get his van back, he was compelled to write a letter. He was not compelled to put in certain statements. And one of those statements was, I asked if they had legal papers. And as I just read to you from the record in Excerpt of Record 308, he indicated he had been shown an identification document, an I-551, by someone he knew wasn't the true person reflected in the I-551. Well, in the case that was the subject of indictment in this prosecution, you have evidence of one of the illegal aliens who indicated that upon his entry into the van, he said to Mr. Zavala, I don't have any papers, I don't have any documents. And Mr. Zavala said, that's okay, get in. And here you have a contact in 1997 in which he indicates at least a knowledge that, you know, that these documents are necessary. And it shows his knowledge or at least a reckless disregard of the alien status of his passengers. The government was required to prove its case beyond a reasonable doubt, which is a heavy burden. And we had to prove that Mr. Zavala knew or recklessly disregarded the fact that both Mr. Levy Camacho and Mr. Bedillo Duran were not legally in the country. And I would submit that this Court has, on a number of occasions, indicated that the government is permitted to prove knowledge through proof of prior bad acts. That's the Ramirez-Yemenez opinion. And that the reason this is done is because it furnishes the link between the knowledge gained in the prior act, as I've just outlined for the Court, and the claimed ignorance of some fact in the offense charged. That's the Mayans' opinion in 1994. And what happened in this trial is on cross-examination of some of the agents, defense counsel kept asking whether or not a Greyhound bus driver could ask someone for documents. And she kept asking whether or not there was a duty to. And then we have this evidence that he did indeed ask for documents back in 1997, coupled with the evidence of the passenger, Levy Camacho, who indicates that he specifically told Mr. Zavala, I have no documents, and Mr. Zavala told him that that was okay to get in. With respect to this issue of 803.8, that would be a compelling argument if this evidence was brought in under 803.8. First of all, this evidence was not published to the jury. That's the 803.8 prohibits police reports coming in as direct evidence and to be published to the jury. This was 803.5. This is recorded recollection. It's not black-letter law that a recorded recollection police report can't be read into the record. In fact, we had submitted motions to admit previously that there was case law that suggests that if the elements of 803.5 can be met, there's nothing in 803.5 that suggests that a police report may not qualify under the recorded recollection exception, so that it's clear that the report itself was not submitted into evidence. The agent was allowed to, after the foundation had been laid, to read the report of incident into the record, and it became essentially his testimony. Indeed, the testimony I just read to the Court from 308 is his testimony from the recorded recollection. It's something different from what counsel is suggesting, that it was we had violated black-letter law by an 803.8 submission. And, Your Honor, there is the other issue that is before the Court I'll just address is the issue of the jury instructions. As indicated in our briefs, this Court has held numerous times that for a theory of defense instruction to be allowed in or for it to be an abuse of discretion to not allow a theory of defense instruction in, you know, the defendant has to show, first of all, that he's entitled to the instruction and that the instruction has to be legally cognizable and there has to be evidence upon which the jury could find for the defendant on that issue, and this Court has said in the Morton opinion in 1993 that it has to be more than a mere scintilla of evidence. Well, I suggest to the Court, as we suggest in our briefs, there is no evidence in the record that was brought forth by defense counsel throughout the trial that this was an incidental trip. Indeed, in her opening statement, she indicated that this was a business of carrying people from the Southwest up to Washington State, and that was the opening statement of defense counsel. Nothing in the record suggests that there was any kind of defense put forth or any evidence put forth about this being an incidental trip. Thank you, counsel. Mr. Carr, you have some reserve time. Your Honor, there is only one Ninth Circuit case that is allowed in evidence of alien smuggling when there wasn't even at least an arrest, and that is the Ramirez-Jimenez case, and that case is very different from this because they had an officer who testified, based on his personal knowledge, that he saw the defendant involved in the close proximity with individuals who were in an alien smuggling ring, and when this individual was arrested later, close in time to the personal observation that the modus operandi was strikingly similar to what the modus operandi of this organization the agent was able to connect the individual with. In this case, we have 3 years and 8 months. Now, remoteness, if it's a prior conviction, it can be 10 years, it can be 15 years, it's because we have indiscreet reliability. All they do is submit the judgment of conviction to the record. When there's no arrest and there's no conviction, remoteness becomes a much different question because in this case, we don't have anybody who remembers what happened, and the government is wrong when they say that 8035 can trump 808. It can't. Just because a police officer happens to not remember what happened, suddenly police reports don't get read to the jury. There's the government's sight in no case that supports that. I haven't been able to find one. It doesn't exist. With the jury instruction, the jury instruction is important in this case because the merino furtherance of language is what protects common carriers from prosecution. You can have a greyhound driver, stops, dirty, smelly Hispanics get on his bus. He might know at that time these guys are probably illegal. He might recklessly disregard it. But what this court held recently in Hernandez-Guardo, 228F3D1017, and it's cited in the briefs, that the United States must not only prove knowledge or reckless disregard of the fact that the alien transported illegal aliens, the government must also prove the defendant intended to further the alien's illegal presence. Greyhound bus driver does not intend to further their illegal presence. He's just doing his job. Mr. Zabala has a legitimate transport business. He's just doing his job. His purpose was not to further their illegal intent. His purpose was to make a buck as a common carrier. And that's why we have this instruction, this added layer of protection. It's important, and it's important in this case. The jury should have been given the defendant's theory of defense instruction. Thank you. Thank you, counsel. The case just argued will be submitted for decision.
judges: Hall, O'scannlain, Beistline